**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

MICHAEL K.,[1]                          )
                                        )
    *Plaintiff,*                    )
                                        )
       v.                        )    Civil No. 3:25-cv-121-SLS
                                        )
FRANK BISIGNANO,                        )
Commissioner of Social Security,        )
                                        )
    *Defendant.*                    )
                                        )

**MEMORANDUM OPINION**

In this action, Plaintiff Michael K. seeks review of the Commissioner of the Social Security

Administration's ("SSA's") decision to deny his Title II application for disability insurance

benefits. This matter comes before the Court on cross-motions for summary judgment, which have

been fully briefed, making this matter ripe for review. (ECF Nos. 9, 10, 11, 13.) The Court

exercises jurisdiction with the consent of the parties pursuant to 28 U.S.C. § 636(c)(1) (ECF Nos.

12, 14) and pursuant to 42 U.S.C. § 405(g).

Plaintiff moves the Court to reverse the Commissioner's decision denying him social

security benefits and to remand this matter for an award of benefits or, alternatively, for further

administrative proceedings consistent with the law. (ECF No. 9, at 1; ECF No. 10, at 1, 18.) As

the basis for such relief, Plaintiff argues that the Administrative Law Judge's ("ALJ's") residual

functional capacity ("RFC") determination is not supported by substantial evidence because she:

(1) erred in evaluating Plaintiff's subjective complaints of fatigue; and (2) improperly evaluated

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that federal courts refer to claimants by their first names and last initials in social security cases.

medical opinion evidence from Plaintiff's treating neurologist, Dr. Jonathan Bekenstein.  (ECF No. 10, at 1-2, 15; ECF No. 13, at 2-6.)  Plaintiff also challenges the ALJ's step five findings, contending that the ALJ: (1) failed to explain why she applied the Medical-Vocational Guidelines for light work, instead of sedentary work; and (2) erred in relying on the vocational expert's ("VE's") testimony regarding job numbers.  (ECF No. 10, at 2, 13-17; ECF No. 13, at 3-4, 6-7.)

In response, the Commissioner contends that substantial evidence supports the ALJ's RFC assessment because the ALJ appropriately considered Plaintiff's subjective complaints, medical records, and medical opinion evidence, including Dr. Bekenstein's opinion.  (ECF No. 11, at 12-16.)  The Commissioner further argues that the ALJ properly considered the Medical-Vocational Guidelines, solicited VE testimony in accordance with the regulations, and reasonably relied on the VE's expert testimony regarding job numbers at step five.  (ECF No. 11, at 16-22.)  The Commissioner asks that the Court affirm the ALJ's decision.  (ECF No. 11, at 22.)

For the reasons set forth below, the Court finds that the ALJ's consideration of Plaintiff's subjective complaints, the medical opinion evidence, the Medical-Vocational Guidelines, and VE testimony comports with applicable legal standards and that substantial evidence supports the ALJ's conclusions.  Therefore, the Court will DENY Plaintiff's Motion for Summary Judgment (ECF No. 9), GRANT the Commissioner's Motion for Summary Judgment and Brief in Support Thereof (ECF No. 11), and AFFIRM the final decision of the Commissioner.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on January 24, 2023, alleging disability beginning on August 14, 2022.  (Administrative Record ("R.") at 59, 181-84.)[2]  In his

---

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. Civ. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers from this

application, Plaintiff alleged that he suffered from a stroke in August 2022, partial paralysis on the right side from face down to his toes, trouble with speech, numbness on the right side of his mouth, blood clots, weakness on the right side, fatigue, diabetes, high blood pressure, and right shoulder pain. (R. at 225.) The SSA denied Plaintiff's claims initially and again upon reconsideration. (R. at 59, 78.) Plaintiff requested a hearing before an ALJ, and one was held on December 4, 2024. (R. at 34-58, 108.)

On December 12, 2024, the ALJ issued a written decision, finding Plaintiff not disabled under the Social Security Act ("the Act"). (R. at 14-26.) On January 13, 2025, the SSA Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual has a disability "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

SSA regulations set forth a five-step process to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing

---

Memorandum Opinion. The Court will further restrict its discussion of Plaintiff's medical information to the extent necessary to result in a proper analysis of the case.

the ALJ's five-step sequential evaluation).  At step one, the ALJ reviews the claimant's current work activity to determine if he or she has been participating in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).  At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.  *Id.* § 404.1520(a)(4)(ii).  At step three, the ALJ determines whether the medical impairments meet or equal an impairment listed in the regulations.  *Id.* § 404.1520(a)(4)(iii).  Between steps three and four, the ALJ determines the claimant's RFC, which accounts for the most that the claimant can do despite his or her impairments.  *Id.* § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform his or her past employment given his or her RFC.  *Id.* § 404.1520(a)(4)(iv).  The burden of proof remains with the claimant through step four of the analysis, and the claimant must prove that his or her limitations preclude the claimant from performing his or her past relevant work.  *See Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).  If such past work can be performed, then benefits will not be awarded, and the analysis ends.  *See* 20 C.F.R. § 404.1520(f).  However, if the claimant cannot perform his or her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant can perform other work that is available in the national economy.  *See id.* § 404.1520(a)(4)(v).  The Commissioner usually offers this evidence through the testimony of a vocational expert.  *See Mascio*, 780 F.3d at 635.

In reviewing a decision to deny benefits, the Court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'"  *Id.* at 634 (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could

accept as adequate to support a conclusion. *See Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). Thus, a decision by the Commissioner is not subject to reversal merely because substantial evidence would have supported a different conclusion. *Id.*

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (second alteration in original)); *see Craig*, 76 F.3d. at 589. The Court must consider the support for the Commissioner's decision and "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). If a fact is supported by substantial evidence, the Court must affirm, regardless of whether the Court agrees with such findings. *Hancock*, 667 F.3d at 476 (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). If the Commissioner's findings are arbitrary or unjustified, then they are not supported by substantial evidence, and the Court must reverse the decision. *See Breeden*, 493 F.2d at 1007.

### III.   THE ALJ'S DECISION

The ALJ analyzed Plaintiff's disability claim under the five-step evaluation process. (R. at 15-26); *see* 20 C.F.R. § 404.1520(a)(4); *Mascio*, 780 F.3d at 634. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since August 14, 2022 (the alleged onset date). (R. at 17.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: disorders of the skeletal spine; other and unspecified arthropathies;

5

vascular insult to the brain; peripheral neuropathy; and other disorders of the nervous system. (R. at 17.)  At step three, the ALJ concluded that Plaintiff did not have an impairment, individually or in combination, which met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-19.)

The ALJ then determined Plaintiff's RFC. (R. at 19-24.)  Based on the record, the ALJ found that Plaintiff retained the ability to perform light work as defined by 20 C.F.R. § 404.1567(b) with the following limitations:

> [Plaintiff] can stand and/or walk for up to four hours in an eight-hour workday.  He can lift up to 10 pounds with the right, non-dominant upper extremity.  [Plaintiff] can occasionally operate foot controls with the right lower extremity; and occasionally push, pull, and reach overhead with the right, non-dominant upper extremity.  He can frequently handle and occasionally finger with the right, non-dominant hand.  [Plaintiff] can frequently balance; occasionally stoop, kneel, crouch, crawl, or climb ramps and stairs; and never climb ladders, ropes, or scaffolds.  He can tolerate frequent exposure to vibration, but he can never be exposed to hazards – such as unprotected heights and machinery with open, moving parts.

(R. at 19-20.)

In arriving at the RFC, the ALJ first summarized Plaintiff's subjective complaints. (R. at 20-21.)  Plaintiff testified that he was unable to return to full-time employment due to ongoing difficulties with his right leg and arm. (R. at 20.)  He stated that he used a brace on his right leg to assist with ambulation, but that he cannot walk or maintain balance for long distances. (R. at 20.)  Plaintiff also reported that he had a restricted range of motion in his right shoulder and could only open his fingers on the right side for ten seconds before they close. (R. at 20.)  He testified that these symptoms prevented him from bearing weight with his upper right extremity and that he could not carry more than five pounds. (R. at 20.)  Plaintiff stated that his mobility restrictions had improved since the alleged onset date, but not more than twenty-five percent of normal. (R. at 20.)  He reported speech difficulties when speaking for long periods of time and that he suffered

from ongoing face and mouth numbness and paralysis due to a cerebrovascular accident. (R. at 20.)

Plaintiff testified that he was "limited in his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use his hands" due to his impairments. (R. at 20.) He reported being able to drive, but could no longer use a manual transmission, and stated that his wife assisted in completing household projects and paying bills. (R. at 21.) Plaintiff testified that he could read, write, count change, manage a checking account independently, and drive short distances daily. (R. at 20.) He could also care for personal hygiene needs with the help of a shower bar, prepare simple meals, wash laundry, take out the trash, complete light household cleaning, wash dishes, shop for personal needs, communicate with others, and attend medical appointments. (R. at 21.)

Next, the ALJ summarized Plaintiff's medical records pertaining to his physical impairments. (R. at 21-23.) In 2018, prior to the period at issue, Plaintiff was placed on oral diabetic treatments. (R. at 21.) In 2019, Plaintiff was offered additional insulin to supplement his diabetic treatment because his diabetes remained uncontrolled. (R. at 21.) In early 2022, medical records indicated that Plaintiff was not taking medication to control his diabetes nor was he regularly checking his blood sugar. (R. at 21.)

In August 2022, Plaintiff presented with "transient aphasia, weakness, and facial drooping." (R. at 21.) An MRI revealed "a left internal capsule stroke and a right co[r]pus callosum small infarct." (R. at 21.) There was also "an acute partially occlusive superficial vein thrombosis involving the right basilic arm." (R. at 21.) Cardiopulmonary studies taken at the same time otherwise found no significant abnormalities or disease. (R. at 21.) After Plaintiff's symptoms stabilized, Plaintiff received a "comprehensive regimen of speech and occupational

7

therapy." (R. at 21.)  Once therapy was completed, Plaintiff's treatment notes documented he "met all goals" and "no additional services were needed."  (R. at 21.)

In early 2023, follow-up treatment records reported worsening weakness in Plaintiff's right arm. (R. at 21.)  Plaintiff reported that "he tripped and fell while holding a cane with his left arm." (R. at 21.)  An electromyography (EMG) revealed "evidence of a right upper trunk brachial plexopathy," and a physical assessment found 2/5 strength in both Plaintiff's bicep and rotator cuff.  (R. at 21.)  However, records indicated that a brachial plexus injury was unlikely to cause significant nerve damage and that Plaintiff's strength should recover with time.  (R. at 22.)  An MRI noted supraspinatus tendinopathy and adhesive capsulitis, but no evidence of a structural abnormality.  (R. at 21.)  Providers recommended injections for pain relief and continued outpatient therapy.  (R. at 21.)  Providers also encouraged Plaintiff to continue activity modifications and physical therapy and to maintain a home exercise program. (R. at 21.) February 2023 records evidenced ongoing right-sided weakness but documented Plaintiff's speech as intact and described Plaintiff as fully active and able to carry on all pre-disease performance without restriction.  (R. at 21, 22.)

In April 2023, examinations noted reduced strength in the right upper and lower extremities.  (R. at 22.)  In June 2023, an MRI of Plaintiff's cervical spine revealed multilevel degenerative changes, including "lateral recess narrowing with mild left and moderate right narrowing at C5-C6." (R. at 22.)  There was evidence of "chronic lacunar infarcts of the left basal ganglia and left corona radiata."  (R. at 22.)  An MRI of the upper extremity found no pathology in the right or left medial brachial plexus. (R. at 22.)  In August 2023, Plaintiff reported 0/10 pain. (R. at 22.)  During November 2023, Plaintiff's treatment records noted "good recovery, but ongoing significant spasticity." (R. at 22.)  On November 18, 2023, Plaintiff began Botox therapy

8

and assessments from that time noted that his facial expression was "symmetric without paresis, spasms, or synkinesis." (R. at 22.) An examination showed intact sensation to touch bilaterally, no joint deformities or contractures, 5/5 strength on the left side and 4+/5 for the right upper and lower extremities. (R. at 22.) Plaintiff continued physical therapy without complications. (R. at 22.)

The ALJ then addressed Plaintiff's most recent treatment records. (R. at 22.) Those noted that Botox therapy had improved spasticity, which allowed some release of his right hand and made driving and other daily activities "much better." (R. at 22.) Plaintiff continued to have a subtle right hemiparetic gait and a minimally diminished lower right face, but his strength on the right side remained 4- to 4/5. (R. at 22.) He presented as "alert, oriented x3, and in no apparent distress." (R. at 22.) Plaintiff continued physical therapy without complications. (R. at 22.)

After considering the record evidence, the ALJ determined that the "findings of [Plaintiff]'s treating and examining sources do not support the severity of restrictions that Plaintiff has alleged." (R. at 22.) Although Plaintiff suffered ongoing right-sided weakness due to a left internal capsule stroke and a right corpus callosum small infarct, his speech remained intact, and he was "fully active and able to carry on all pre-disease performance without restriction." (R. at 22.) Providers advised Plaintiff that his brachial plexus injury was unlikely to result in significant nerve damage and that his strength should recover. (R. at 22.) He maintained 4- to 4/5 strength on his right side. (R. at 22.) Even when the ALJ considered Plaintiff's cervical spine irregularities, the medical records reflect that Plaintiff continued to recover his strength with outpatient therapy. (R. at 22.)

The ALJ concluded that even when she considered Plaintiff's subjective complaints not addressed by clinical findings, the record still did not reflect significant additional restrictions because of his continued ability to perform a variety of activities of daily living, including personal

hygiene, cooking, cleaning, driving, shopping, and managing finances.  (R. at 22-23.) Considering these abilities and the "otherwise grossly normal left sided dominant physical findings," the ALJ determined that Plaintiff could perform a reduced range of light work.  (R. at 23.)  To account for his diminished upper and lower extremity strength on the right side, the ALJ limited Plaintiff to no more than four hours of standing and/or walking and, for the right extremities, no more than ten pounds of lifting/carrying, occasional foot controls, frequent handling, occasional fingering, and occasional pushing, pulling, and reaching overhead.  (R. at 23.)  The ALJ added postural and environmental restrictions to account for diminished mobility and safety concerns.  (R. at 23.)  The ALJ concluded that Plaintiff's "allegations of greater restrictions are not entirely consistent with the adopted [RFC], because they are not supported by the conservative and grossly outpatient treatment history during the period at issue, the clinical and examination findings of no acute complications, and [Plaintiff]'s stated ongoing capabilities."  (R. at 23.)

The ALJ then considered the medical opinions and prior administrative medical findings.  (R. at 23-24.)  The ALJ first considered the prior administrative medical findings.  (R. at 23.)  In September 2023, Drs. Howard Leizer and Joseph Duckwall found that Plaintiff could perform a "reduced range of light work activity with postural, manipulative, and environmental restrictions."  (R. at 23.)  In 2024, Dr. Robert McGuffin opined that Plaintiff could perform "light work with frequent balancing; no climbing of ladders, ropes, or scaffolds; and occasional all other posturals."  (R. at 23.)  Dr. McGuffin also limited Plaintiff to occasional overhead reaching on the right, frequent handling with the right arm/hand, and occasional fingering with the right hand due to decreased grip strength.  (R. at 23.)  The ALJ found Dr. McGuffin's opinion more persuasive, as it was "well supported by referenced records at the time of the assessment and with the records submitted at the hearing level of review."  (R. at 23.)  The ALJ also added additional restrictions,

10

including no more than four hours of standing and/or walking and ten pounds of right-sided lifting, given Plaintiff's more recent records and hearing testimony.  (R. at 23.)

The ALJ then considered the medical opinion of Dr. Jonathan Bekenstein, Plaintiff's treating provider.  (R. at 23-24.)  In a November 12, 2024 opinion, Dr. Bekenstein limited Plaintiff to two hours of sitting, less than two hours of standing and/or walking, and occasional lifting of less than ten pounds of weight.  (R. at 23.)  Dr. Bekenstein found that Plaintiff needed to shift positions at will from sitting, standing, and walking during the workday and that Plaintiff required additional ten-minute breaks twice a day.  (R. at 23, 24.)  Dr. Bekenstein restricted Plaintiff from using his upper right extremity for any activity and limited Plaintiff's use of his left hand, fingers, and arm to eighty percent.  (R. at 24.)  Finally, Dr. Bekenstein opined that Plaintiff would miss work about two days per month and would be off task about fifteen percent of the workday.  (R. at 24.)  The ALJ found Dr. Bekenstein's opinion not fully persuasive because it was not supported by his own referenced clinical findings and inconsistent with Plaintiff's medical records documenting "no more than mild ongoing right sided upper and lower non-dominant strength restrictions" and Plaintiff's capacity for many activities of daily living.  (R. at 24.)

At step four, the ALJ found that Plaintiff had no past relevant work.  (R. at 24.)  The ALJ then determined Plaintiff's vocational factors, including that he had a high school education and met the definition of a younger individual on the alleged onset date, but had subsequently changed age categories to an individual closely approaching advanced age.  (R. at 24-25.)

At step five, the ALJ considered Plaintiff's vocational factors and RFC to determine whether Plaintiff could perform jobs existing in significant numbers in the national economy.  (R. at 25.)  The VE identified the occupations of paper-pattern inspector (with approximately 23,500

11

jobs in the national economy), checker I (with approximately 7,500 jobs in the national economy),[3] and rental clerk (with 18,000 jobs in the national economy).  (R. at 25.)  When asked whether her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), the VE noted that the checker I position required frequent fingering according to the DOT, so she provided reduced job numbers to account for the occasional restrictions in the RFC.  (R. at 25.)  She further testified that where the DOT did not address issues, such as non-dominant upper and lower extremity restrictions, overhead reaching, reduced standing and/or walking limitations, and types of climbing, she based her testimony regarding those issues on her professional judgment, education, and years of experience.  (R. at 25.)  Based on the VE's testimony, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy considering his age, education, work experience, and RFC.  (R. at 25.)  Therefore, the ALJ found Plaintiff not disabled from August 14, 2022 (the alleged onset date) through December 12, 2024 (the date of the decision).  (R. at 26.)

## IV.    ANALYSIS

Plaintiff raises challenges both to the ALJ's RFC determination and to her findings at step five.  The Court addresses Plaintiff's arguments below and finds no reversible error.

### A.  **Substantial Evidence Supports the ALJ's RFC Determination**

The Court finds that the ALJ reasonably accounted for Plaintiff's limitations in the RFC and sufficiently explained how she made those determinations.  The ALJ acknowledged Plaintiff's reports of ongoing issues with his right arm and leg following his stroke, including difficulties with walking long distances and dealing with limited right arm and hand range of motion.  (*See* R.

---

[3] The ALJ misstated the number of jobs in the national economy for the paper-pattern inspector and checker I jobs.  (R. at 25.)  The VE originally identified those job numbers as approximately 47,000 and 15,000 respectively but subsequently reduced those numbers by half in response to a follow-up hypothetical adding a limitation consistent with Plaintiff's RFC.  (R. at 53-54.)

at 20.)  To account for these limitations, the ALJ restricted Plaintiff to a reduced range of light work, including standing and walking for four hours a workday and lifting ten pounds with his right non-dominant hand.  (R. at 19-20.)  She also included additional right-side restrictions for operating foot controls, pushing, pulling, and reaching, and handling and fingering.  (R. at 19-20, 23.)  Finally, to account for mobility issues and safety concerns, the ALJ imposed postural and environmental restrictions.  (R. at 19-20, 23.)

In declining to impose greater restrictions, the ALJ noted that medical records documented 4- to 4+/5 strength in the right extremities and improved functioning with conservative treatment, including occupational and physical therapy, medication, and Botox injections.  (R. at 21-22.)  The ALJ also relied on Plaintiff's ability to perform a wide range of activities, including caring for his personal hygiene needs, preparing meals, washing clothes and dishes, taking out the trash, completing light household chores, driving short distances daily, shopping, and caring for his children.  (R. at 23.)   Further, the ALJ considered the prior administrative medical findings of state agency consultants, who limited Plaintiff to light work with postural, environmental, and right arm restrictions.  (R. at 23.)  This constitutes substantial evidence supporting the RFC determination.  As discussed below, Plaintiff's disagreements with the ALJ's weighing of the record evidence do not justify remand.

> 1.  *The ALJ Applied Correct Legal Standards in Evaluating Plaintiff's*
> *Subjective Complaints*

Plaintiff argues that the ALJ erred in evaluating his subjective complaints of fatigue.  (ECF No. 10, at 15; ECF No. 13, at 5-6.)  Specifically, Plaintiff contends that the ALJ failed to "properly consider fatigue in combination with [Plaintiff]'s other impairments when determining the RFC."  (ECF No. 10, at 15.)  Contrary to Plaintiff's argument, the ALJ evaluated Plaintiff's reported

subjective complaints as required by applicable legal standards.  Substantial evidence supports the ALJ's RFC determination.

a)  Standard for Evaluating Subjective Complaints

The regulations provide a two-step process for evaluating Plaintiff's subjective complaints. 20 C.F.R. § 404.1529; *see also* Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  At the first step, "the ALJ must determine whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (quoting 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029).  At the second step, "after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled." *Id.*  The ALJ must consider all available evidence in this determination, including objective medical evidence, "an individual's statements about the intensity, persistence, and limiting effects of the symptoms," and medical opinions and statements from others. *See id.*  The claimant does not need to produce objective evidence to satisfy this second prong. *Id.*

b)  The ALJ Properly Evaluated Plaintiff's Subjective Complaints

Here, the ALJ followed the two-step process in considering Plaintiff's subjective complaints.  Specifically, at the hearing, Plaintiff reported experiencing ongoing difficulties with his right leg and arm.  (R. at 20, 44.)  He testified that he could walk without a brace but at a "super slow pace," and with a brace on his right leg, he "can take more steps, but [he] still can't go fast," and that he experiences balance issues over longer distances.  (R. at 20, 44.)  Plaintiff stated he could not bend over "like most people would" to pick up something he dropped.  (R. at 45.)

14

Plaintiff also reported that he had a restricted range of motion with right arm reaching and testified that he had trouble keeping his fingers open and gripping items with his right hand. (R. at 20, 44-46.)  He stated that these symptoms prevented him from bearing weight with his upper right extremity and that he could not carry more than five pounds. (R. at 20, 45-46.)  Plaintiff reported improvement in his mobility restrictions since the alleged onset date, but not more than twenty-five percent of normal. (R. at 20, 45.)  He also testified to ongoing speech difficulties when speaking for long periods of time due to facial numbness and paralysis. (R. at 20, 46.)  At the hearing, Plaintiff did not identify any other issues or symptoms impacting his ability to work.[4] (R. at 44-50.)

After summarizing Plaintiff's subjective complaints, the ALJ found, at the first step, that Plaintiff's medically determinable impairments could lead to the alleged symptoms. (R. at 21.)  At the second step, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." (R. at 21.)

The ALJ acknowledged Plaintiff's impairments and provided a summary of the medical record, treatment plan, and Plaintiff's daily activities. (R. at 20-23.)  Following the ALJ's evaluation of Plaintiff's symptoms and analysis of the record, the ALJ determined that Plaintiff's allegations of greater restrictions were "not entirely consistent." (R. at 23.)  The ALJ then explained how she accounted for Plaintiff's impairments. (R. at 23.)  She limited Plaintiff to a

---

[4] Plaintiff also completed two Function Reports at the initial and reconsideration levels. (R. at 233-41, 275-83.)  In each report, Plaintiff did not list fatigue or tiredness once. (*See* R. at 233-41, 275-83.)  His main complaint was limited use of his right arm and leg. (R. at 233, 275.)  Plaintiff continued to report a wide variety of daily activities, including caring for his children, shopping, and going out to eat and to the park, among others. (R. at 235-38, 277-80.)

reduced range of light work given the "grossly normal left sided dominant physical findings." (R. at 23.) To account for Plaintiff's "diminished upper and lower extremity strength on the right side," the ALJ limited Plaintiff to no more than four hours of standing, ten pounds of carrying and lifting, occasional foot controls, frequent handling, occasional fingering, and occasional pushing, pulling, and reaching overhead. (R. at 23.) The ALJ then added postural and environmental restrictions considering Plaintiff's diminished mobility and safety concerns. (R. at 23.) In declining to adopt greater limitations, the ALJ identified inconsistencies between Plaintiff's subjective complaints on the one hand and Plaintiff's medical record, conservative and outpatient treatment history, and ongoing activities on the other hand. (R. at 22-23.) This constitutes substantial evidence supporting the ALJ's RFC assessment.

c)  The ALJ Did Not Err in Failing to Address Fatigue

While Plaintiff contends that the ALJ erred by not considering his "limitations caused by fatigue" (ECF No. 10, at 15), this argument fails for several reasons. First, Plaintiff did not mention fatigue as an impairment or a symptom in his hearing testimony (R. at 34-58) or Function Reports (R. at 233-41, 275-83).[5] In response to the ALJ's question, "I want to hear from you in your own words[;] [w]hat is it that prevents you from working and why you feel you can't work?", Plaintiff responded, "there's basically two things wrong; my [right] leg and my [right] arm." (R. at 44.) Later, when asked, "So nothing else other than your arm and your leg that's preventing you from working?", Plaintiff identified mouth and face numbness or paralysis which can cause speech

---

[5]  When Plaintiff applied for disability insurance benefits, he identified fatigue as a condition that limited his ability to work. (R. at 225.) However, in Plaintiff's Function Reports and throughout his hearing testimony, he never once mentioned fatigue as a condition or a symptom that impacted his abilities. (*See* R. at 34-58, 233-41, 275-83.) Additionally, the record lacks much evidence of fatigue at all, with limited mentions of Plaintiff's fatigue post-therapy sessions. (*See, e.g.*, R. at 497, 1471, 3163, 3314, 3495.)

16

issues when talking for long periods.  (R. at 46.)  He then replied, "But other than that, not much else."  (R. at 46.)  Plaintiff's attorney at the hearing then asked a series of questions but did not elicit any answers suggesting that fatigue impacted Plaintiff's ability to work.  (R. at 49-50.)  Given the scope of Plaintiff's subjective reports, it comes as no surprise that the ALJ did not discuss fatigue in the symptom analysis.  Instead, the ALJ meaningfully addressed the symptoms identified by Plaintiff – including right-sided weakness following his stroke, mobility limitations, numbness and paralysis, and limitations using his right hand.  (R. at 20, 23.)

Second, the over 3,000-page record contains very few references to fatigue.  The few complaints mentioned mainly arose after therapy sessions.  (*See, e.g.,* R. at 497, 1471, 3163, 3314, 3495.)  Otherwise, throughout the record, there are many instances where Plaintiff denies fatigue at all.  (*See, e.g.,* R. at 2119, 2130, 2141, 2152, 2162, 2171, 2181, 2192, 2201, 2210, 2227, 2241, 2261, 2275, 2282, 2505.)  Additionally, Plaintiff's own treating physician, Dr. Bekenstein, did not list fatigue as a symptom that Plaintiff experienced in his November 12, 2024 Physical Medical Opinion.  (R. at 3651-54.)  The form completed by Dr. Bekenstein specifically asked, "what symptoms cause a need for breaks?", and one of the check boxes listed "[c]hronic fatigue" as a potential answer.  (R. at 3652.)  Dr. Bekenstein did not check that box and instead identified "[m]uscle weakness," "[p]ain/ paresthesias, numbness," and "[o]ther: spasticity" as reasons for needed breaks.  (R. at 3652.)  On this record, considering Plaintiff's subjective complaints and given the sparse references to fatigue within the treatment notes, the ALJ did not err in not discussing fatigue.  *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (stating that there is "no rigid requirement that the ALJ specifically refer to every piece of evidence in h[er] decision") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)).

17

Third, the ALJ found Dr. McGuffin's opinion persuasive, adopted a similar RFC, and even added additional restrictions to account for Plaintiff's impairments and complaints. (R. at 19-20, 23.)  Dr. McGuffin, in turn, acknowledged that Plaintiff listed fatigue on his application for disability benefits and considered that among other symptoms in rendering his opinion. (R. at 74-76.)  In *Dendy v. Berryhill*, the Court found no error when an ALJ did not explicitly discuss plaintiff's specific complaints of fatigue but instead gave "great weight" to a doctor's opinion who considered fatigue when formulating the RFC.  No. 2:16-cv-3570, 2018 WL 1801639, at *6 (D.S.C. Jan. 22, 2018), *report and recommendation adopted*, 2018 WL 1081501 (D.S.C. Feb. 28, 2018).  In that case, the claimant had a variety of medical records documenting her ongoing struggles with fatigue, which was considered "severe" and caused instances of "near fainting," having to lie down after showering, and taking over thirty minutes to get dressed. *Id*. at *5.  The claimant even stated her severe fatigue was the "source of her problems." *Id*.  The Court found that the ALJ properly accounted for the claimant's fatigue by adopting an RFC consistent with a medical opinion that "explicitly considered the Plaintiff's fatigue in formulating her" limitations. *Id*. at *6.  Similarly, the ALJ here found Dr. McGuffin's opinion persuasive, and adopted a comparable RFC determination with *more* restrictive limitations. (R. at 19-20, 23.)   By finding Dr. McGuffin's opinion persuasive and adopting an even more restrictive RFC, the ALJ properly considered Plaintiff's report of fatigue from his disability application.

Plaintiff relies on *Wallace v. Saul* to argue otherwise, contending that the ALJ's failure to "properly consider fatigue in combination with [Plaintiff]'s other impairments when determining the RFC" led to an "incomplete assessment." (ECF. No. 10, at 15 (citing No. 4:19-cv-2077, 2020 WL 8455076, at *6 (D.S.C. Nov. 3, 2020), *report and recommendation adopted*, 2021 WL 49949 (D.S.C. Jan 6, 2021)).) The Court finds the *Wallace* case distinguishable.  The claimant in *Wallace*

had a well-documented history of chronic fatigue. 2020 WL 8455076, at *4-5. The claimant testified that he "could not stay up with the fatigue and was only working four hours a day." *Id*. at *4. Fatigue was documented as his "main complaint" multiple times and was found in several doctors' assessments. *Id*. at *4-5. Additionally, in a treating physician's medical opinion, the physician opined that the plaintiff suffered from "ongoing chronic fatigue" that impacted his ability to sustain a workweek. *Id*. at *5. In other medical records, the claimant denied excessive fatigue and reported feeling better. *Id*. at *4-5. The ALJ noted these inconsistencies, but "never explained or resolved such evidence." *Id*. at *5. The Court found that the RFC could not be supported by substantial evidence because it was "left to guess how the abnormals and normals regarding fatigue support the implicit conclusion of sustainability of a workweek." *Id*.

Unlike in *Wallace*, the record here fails to show chronic fatigue as an issue for Plaintiff and does not contain "material inconsistencies or ambiguities" regarding symptoms of fatigue for the ALJ to resolve. *See id*. As stated above, Plaintiff did not testify to experiencing symptoms of fatigue, he failed to mention fatigue in his Function Reports, and his treating physician's Physical Medical Opinion did not list or check fatigue as a symptom or diagnosis. (R. at 3651-52.) The few mentions of fatigue found across an extensive record do not suggest a "situation where the ALJ just ignored a claimant's principal argument or significant evidence when assessing [his] RFC." *Turner v. Comm'r Soc. Sec.*, No. 23-1760, 2024 WL 2764722, at *5 (4th Cir. May 30, 2024). Instead, the ALJ properly evaluated the evidence—including Plaintiff's subjective complaints—when arriving at the RFC determination. The Court finds no error.

> 2. *The ALJ Applied Correct Legal Standards When Evaluating Dr. Bekenstein's Opinion*

Plaintiff argues for the first time in his reply brief that the ALJ failed to properly consider the medical opinion of Dr. Jonathan Bekenstein, Plaintiff's treating neurologist, when determining

19

Plaintiff's RFC.  (ECF No. 13, at 1-5.)  As discussed below, the Court finds that the ALJ adequately explained why he found Dr. Bekenstein's opinion unpersuasive and that substantial evidence supports the ALJ's findings.

a)  Applicable Regulations for Evaluating Medical Opinion Evidence

Under applicable regulations,[6] the ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources without deferring or giving any specific evidentiary weight to any medical source.  20 C.F.R. § 404.1520c(a).  Specifically, the ALJ must articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict a medical opinion[,]" including "familiarity with the other evidence or understanding of [the SSA] disability program's policies and evidentiary requirements."  *Id.* § 404.1520c.

Supportability and consistency are the "most important" factors, and the ALJ must discuss how these factors were considered.  *Id.* § 404.1520c(b)(2).  The regulations define supportability and consistency as follows:

> (1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

---

[6] Claims involving medical opinion evidence filed on or after March 27, 2017, are evaluated using a revised regulatory framework.  20 C.F.R. § 404.1520c.

20

*Id.* § 404.1520c(c)(1)-(2).  The ALJ may, but is not required to, explain how the other factors were considered.  *Id.* § 404.1520c(b)(2).

b)  Dr. Bekenstein's Opinion and the ALJ's Assessment

Dr. Bekenstein completed a Physical Medical Opinion on November 12, 2024.  (R. at 3651-54.)  He listed Plaintiff's diagnosis as left basal ganglia stroke and his symptoms as spastic right hemiparesis and neuropathy.  (R. at 3651.)  Dr. Bekenstein opined that Plaintiff was limited to sitting for thirty minutes at a time, standing for twenty minutes at a time, sitting for two hours in an eight-hour workday, and walking for less than two hours in an eight-hour workday.  (R. at 3651.)  He further opined that Plaintiff could walk for half a block without rest or pain and needed five-minute walking periods every thirty minutes during an eight-hour workday.  (R. at 3651, 3652.)  Dr. Bekenstein found that Plaintiff required a job that permitted shifting positions at will from sitting, standing, or walking.  (R. at 3652.)  He further found that Plaintiff will need to take two ten-minute unscheduled breaks during the workday due to his symptoms of muscle weakness, pain/paresthesias, numbness, and spasticity.  (R. at 3652.)

Regarding Plaintiff's ability to lift and carry, Dr. Bekenstein opined that Plaintiff could occasionally lift less than ten pounds.  (R. at 3652.)  He also stated that Plaintiff could rarely twist or climb stairs and could never stoop (bend), crouch/squat, or climb ladders.  (R. at 3653.)  He further opined that Plaintiff had significant limitations with reaching, handling, and fingering.  (R. at 3653.)  During an eight-hour workday, Plaintiff could not use his right side for these activities, but could use his left side for reaching, handling, and fingering for up to eighty percent of a workday.  (R. at 3653.)  Dr. Bekenstein noted that Plaintiff would be off-task fifteen percent of the workday, was capable of moderate stress, and would likely be absent from work two days per month due to his impairments.  (R. at 3653.)

21

After summarizing Dr. Bekenstein's opinion, the ALJ found it "not fully persuasive." (R. at 24.) The ALJ explained that the severe restrictions within Dr. Bekenstein's opinion were not supported by any referenced records of the treating provider and inconsistent with the record as a whole, including "documented examination findings of no more than mild ongoing right sided upper and lower non-dominant strength restrictions" and Plaintiff's ongoing capacity for a wide range of activities of daily living. (R. at 24.) Based on this evidence, the ALJ found Plaintiff not nearly as limited as opined by Dr. Bekenstein's evaluation. (R. at 24.)

Contrary to Plaintiff's argument that the ALJ "improperly discounted" Dr. Bekenstein's opinion (ECF No. 13, at 2), the ALJ's analysis and decision builds a logical bridge between the evidence she considered and her conclusion that the level of limitations opined by Dr. Bekenstein were unsupported and inconsistent with the record. Regarding supportability, the ALJ noted that the prior referenced clinical findings of Dr. Bekenstein did not endorse such severe restrictions. (R. at 24.) Indeed, the ALJ considered Dr. Bekenstein's findings that Plaintiff's strength on the right side ranged from 4- to 4/5 and that Plaintiff experienced some release of his hand that was making driving and other activities of daily living "much better." (R. at 22 (citing Ex. 14F [R. at 3070, 3072]).) Additionally, Dr. Bekenstein acknowledged in his treatment notes that Plaintiff had "full strength in the left arm and left leg" and his "[m]emory, concentration, speech, and knowledge are normal for age and education." (R. at 3072.)

Regarding consistency, the ALJ found substantial record evidence showing that Plaintiff retained capacity to complete a wide variety of activities of daily living. (R. at 24.) For example, Plaintiff reported that he cared for his personal hygiene, cared for his children, prepared meals, completed household cleaning, drove a car, shopped for personal needs, managed his finances, communicated on the phone, and attended medical appointments. (R. at 24 (citing Ex. 4E [R. at

22

233-241]; Ex. 9E [R. at 275-283]).) Therefore, the ALJ properly considered Dr. Bekenstein's opinion in accordance with applicable regulations, and substantial evidence supports the ALJ's conclusions.[7]

Plaintiff also argues that "no examining or treating medical source opined that [Plaintiff] retained the ability to perform the standing/walking demands of light work" (ECF No. 10, at 14) and that the ALJ "wrongfully ignored the … expertise of a treating specialist," instead relying on "non-examining consultants" (ECF No. 13, at 4, 5). However, in declining to give Dr. Bekenstein controlling weight based on his status as a treating provider, the ALJ complied with applicable regulations. For claims filed on or after March 27, 2017, including Plaintiff's, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) … including those from [Plaintiff's] medical sources." 20 C.F.R. § 404.1520c(a). Thus, Dr. Bekenstein's status as a treating provider is one of many factors the ALJ may consider. But the ALJ properly considered consistency and supportability, the two "most important factors," in determining the persuasiveness of Dr. Bekenstein's opinion. *Id*. § 404.1520c(b)(2).

### B. The ALJ Did Not Err in Her Step Five Findings

*1. The ALJ Properly Considered the Medical-Vocational Guidelines, Social Security Ruling 83-12, and Vocational Expert Testimony in the RFC Determination*

Plaintiff next challenges the ALJ's failure to classify Plaintiff's RFC as sedentary work for purposes of the Medical-Vocational Guidelines, which would have directed a finding of "disabled" in Plaintiff's case. (ECF No. 10, at 14 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14); *see*

---

[7] To the extent Plaintiff takes a different view of the evidence (ECF No. 10, at 14; ECF No. 13, at 2, 3, 4-5), the Court cannot reweigh conflicting evidence or substitute its judgment for that of the ALJ. *See Hancock*, 667 F.3d at 472. Here, the ALJ considered the medical records pertaining to Plaintiff's impairments but did not draw the inferences or conclusions Plaintiff wanted. Plaintiff has failed to explain or otherwise show that the ALJ committed legal error and instead invites the Court to reweigh the evidence in his favor, which the Court is not permitted to do.

*also* ECF No. 13, at 3.)  Specifically, Plaintiff argues that the RFC assessment of light work with the added limitation of standing/walking for only four hours "is a limitation more consistent with sedentary work," which "typically requires only two hours of standing/walking per workday." (ECF No. 10, at 14 (citing SSR 96-9p, 1996 WL 374185 (July 2, 1996)).)  He challenges the ALJ's failure to apply the Medical-Vocational Guidelines for sedentary work or "explain why she chose to use the Medical-Vocational Guidelines for light work over the rules for sedentary work."  (ECF No. 10, at 14; *see also* ECF No. 13, at 3.)  This argument fails for several reasons.

First, the ALJ's decision to solicit testimony from a VE instead of allowing a Medical-Vocational Guideline ("Grid rule") to direct a conclusion as to disability comports with applicable law.  Grid rules direct a conclusion as to whether a claimant is disabled when a claimant's vocational factors and RFC coincide with the criteria of a particular Grid rule.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00; *see also Heckler v. Campbell*, 461 U.S. 458, 461-62 (1983). However, SSR 83-12 provides that "[w]here an individual's exertional RFC does not coincide with the definition of any one of the ranges of work defined in … the regulations, the occupational base is affected and may or may not represent a significant number of jobs in terms of the rules directing a conclusion as to disability."  1983 WL 31253, at *2 (1983).  The ruling further states that where "an occupational base is not clear, the adjudicator will need to consult a vocational resource."  *Id*. For example, when an "individual's exertional limitations are somewhere 'in the middle' in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability."  *Id*. at *3.  To help ALJs make this judgment, SSR 83-12 directs ALJs to elicit assistance from vocational specialists, or VEs.  *Id*.

24

The ALJ, here, complied with this ruling.  She found Plaintiff capable of performing a "*reduced range* of light work," meaning the RFC fell between the regulatory guidelines for light work and sedentary work.  (R. at 23 (emphasis added).)  The ALJ then properly followed SSR 83-12 when she elicited testimony from the VE regarding the availability of jobs for Plaintiff.  *See Golini v. Astrue*, 483 F. App'x 806, 808 (4th Cir. 2012) (finding that "the ALJ's decision to rely on the vocational expert's testimony was appropriate" under SSR 83-12 when a plaintiff's RFC placed him outside of the exertional categories contemplated by the Medical-Vocational Guidelines); *see also Fenton v. Saul*, No. 4:19-cv-72, 2020 WL 6380134, at *5 (E.D. Va. June 30, 2020), *report and recommendation adopted*, 2020 WL 5587710 (E.D. Va. Sept. 17, 2020) (finding that when a plaintiff's exertional capacity would "direct different conclusions" under the Medical-Vocational Guidelines, SSR 83-12 directs the ALJ to "call[] upon a vocational expert to determine the remaining occupational base to support a conclusion as to disability").

In arguing otherwise, Plaintiff contends that the four-hour standing/walking limitation converts the RFC into a sedentary one.  (ECF No. 10, at 14.)  But as Plaintiff acknowledges, sedentary work "typically requires only two hours of standing/walking per workday."  (ECF No. 10, at 14 (citing SSR 96-9p, 1996 WL 374185).)  Light work in turn typically involves standing/walking for six hours per workday.  *See* 20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251, at *5-6 (1983).  Thus, the ALJ correctly determined that Plaintiff's RFC fell between two Grid rules directing opposite conclusions and solicited the testimony of a VE to determine the extent of the occupational base available.  (R. at 25); *see also* SSR 83-12, 1983 WL 31253, at *2.

While Plaintiff contends that the ALJ failed to acknowledge the Medical-Vocational Guidelines or explain why she chose not to apply the Grid rules for sedentary work (ECF No. 10, at 14; ECF No. 13, at 3), the ALJ's decision proves otherwise.  The ALJ expressly acknowledged

25

the obligation to consider the Medical-Vocational Guidelines under 20 C.F.R. Pt. 404, Subpt. P, App. 2, explaining that where a claimant "can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile." (R. at 25 (citing SSR 83-11, 1983 WL 31252 (1983)).)  The ALJ then noted that if Plaintiff could perform a full range of light work, the Medical-Vocational Guidelines would direct a finding of "not disabled." (R. at 25 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.13, 202.20).)  However, because Plaintiff's "ability to perform all or substantially all of the requirements of [light] work has been impeded by additional limitations," the ALJ elicited testimony from the VE "[t]o determine the extent to which these limitations erode the unskilled light occupational base." (R. at 25.)  Thus, the ALJ applied correct legal standards and explained the basis for relying on VE testimony in her step five findings.

Plaintiff relies on *Bisceglia v. Colvin*, 173 F. Supp. 3d 326 (E.D. Va. 2016), as support for his challenge to the ALJ's failure to apply Grid rules for sedentary work or address the Medical-Vocational Guidelines for sedentary work.  (ECF No. 10, at 13.)  That decision does not further Plaintiff's argument.  In *Bisceglia*, the ALJ relied on the persuasive opinions of state agency medical consultants to determine the RFC for a claimant.  173 F. Supp. 3d at 330.  However, the ALJ erroneously stated that those consultants recommended light work, when in fact they recommended sedentary work.  *See id.* at 330-36.  That error, combined with the lack of any explanation as to why she reached the determination of light work instead of sedentary work as recommended by the persuasive state agency medical consultant opinions, left a "gap" in the ALJ's reasoning as to why Grid rules for sedentary work should not dictate a finding of disabled.  *Id.; see also Chandler v. Berryhill*, No. 1:17-cv-1346, 2018 WL 4346703, at *15 (E.D. Va. July 26,

2018), *report and recommendation adopted*, 2018 WL 4344462 (E.D. Va. Sept. 11, 2018) (stating that the error in *Bisceglia* was based in part on the conflict between the RFC and the mischaracterized evidence relied on by the ALJ); *Fenton*, 2020 WL 6380134, at *5-6 (same).

Unlike in *Bisceglia*, the ALJ here did not mischaracterize the state agency medical consultants' determinations.  (R. at 23, 60-68, 69-77.)  Instead, the ALJ's RFC determination mirrors the state agency medical opinions limiting Plaintiff to light work, with the ALJ adding further restrictions to account for more recent evidence presented at the hearing level.  (R. at 23-24.)  Even with those further restrictions, the ALJ still found Plaintiff capable of performing a "reduced range of light work."  (R. at 23.)  Because the RFC fell somewhere between the regulatory guidelines for light work and sedentary work, the ALJ correctly consulted with a VE.[8]

### 2. The ALJ Did Not Err in Relying on Vocational Expert Testimony

Plaintiff next contends that the ALJ erred at step five by considering unreliable VE testimony and failing to address Plaintiff's post-hearing objection to the VE's testimony about job numbers.  (ECF No. 10, at 16-17; ECF No. 13, at 6-7.)  The VE testified that an individual limited by the ALJ's hypotheticals would be able to perform the jobs of paper-pattern inspector (23,500 jobs in the national economy), checker I (7,500 jobs in the national economy), and rental clerk (18,000 jobs in the national economy).  (R. at 53-54.)  During the hearing, Plaintiff's counsel questioned the VE about the source of her job numbers.  (R. at 55.)  The VE testified that she used

---

[8] Plaintiff also argues that the hypothetical questions the ALJ posed to the VE did not accurately represent the Plaintiff's RFC, because the hypotheticals did not restrict Plaintiff to sedentary work, which rendered them "deficient." (ECF No. 10, at 16.)  However, as discussed above, substantial evidence supports the ALJ's RFC determination limiting Plaintiff to a reduced range of light work. *See infra* Part IV.A.  Because the Court finds no error in the RFC determination, the Court similarly finds no error in the hypotheticals posed to the VE, which tracked the RFC determination. *See Mascio*, 780 F.3d at 637-38 ("[T]he ALJ may find that [certain limitations do] not affect [claimant]'s ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert.").

a "variety of sources," including the Occupational Employment and Wage Statistics ("OES") and Job Browser Pro. (R. at 56.) The VE stated she used the sources as "guide[s]," along with her professional experience to determine job numbers. (R. at 56-57.) After the hearing, Plaintiff filed a post-hearing objection to the VE's testimony, objecting to the VE's number of paper-pattern inspectors. (R. at 296-97.) Plaintiff argues that the VE's testimony inaccurately represented the number of available jobs in the national economy that Plaintiff could perform. (ECF No. 10, at 17.) Plaintiff points to alleged inconsistencies between the VE's testimony and the data from some of the sources that the VE used to calculate the job numbers. (ECF No. 10, at 17.) The ALJ overruled Plaintiff's post-hearing objection in her decision. (R. at 14-15.) Plaintiff argues that the ALJ failed to sufficiently respond to his post-hearing objections in her opinion, constituting a reversible error. (ECF No. 10, at 16-17.)

Plaintiff's argument fails for four reasons. First, although Plaintiff contends that he timely submitted a written objection (ECF No. 10, at 17), Plaintiff should have made an objection to the VE's testimony during the hearing. During the hearing, the ALJ asked Plaintiff, who was represented by counsel, if he had any objections to the VE's qualifications. (R. at 51.) No objections were raised. (R. at 51.) Plaintiff's counsel had the opportunity to examine the VE and ask her how she calculated her job numbers. (R. at 55-58.) The VE explained that the OES and Job Browser Pro, the only two sources that Plaintiff points to in his objection, are just "guide[s]" and two of a "variety of sources" that she used. (R. at 56-57.) Plaintiff, by counsel or otherwise, did not raise any objections to the VE's testimony at any time during the hearing. (R. at 51-58.)

This Court has consistently held that a Plaintiff must raise an objection to a VE's testimony during the hearing. *See Patricia Louise Revere v. Berryhill*, No. 3:17-cv-774, 2019 WL 99303, at *3-4 (E.D. Va. Jan. 3, 2019) ("When objecting to a VE's testimony, a plaintiff must raise the

argument during the hearing or risk waiving it."); *Sylvia M. v. Saul*, No. 3:19-cv-428, 2020 WL 5047066, at *6 n.5 (E.D. Va. Aug. 26, 2020), *aff'd sub nom.*, *McCall v. Saul*, 844 F. App'x 680 (4th Cir. 2021) ("Because Plaintiff, represented by counsel, did not challenge the VE's data sources during her hearing before the ALJ, Plaintiff has waived her right to raise that challenge here."). The ALJ did not err in overruling Plaintiff's objection because it was not raised during the hearing.

Second, regardless of whether Plaintiff was required to raise his objection during the hearing, the ALJ sufficiently addressed Plaintiff's objection to the VE's testimony in her decision. (R. at 14-15.)  The ALJ first noted that Plaintiff raised no objections to the VE's qualifications during the hearing.  (R. at 14.)  Then, the ALJ pointed to the VE's professional expertise in the field of vocational rehabilitation as supporting her job numbers and that the data sources Plaintiff raises are just two of many sources relied on by the VE.  (R. at 14-15.)  Finally, the ALJ opined that even if the number for one of the identified occupations was incorrect as alleged by Plaintiff, the two additional occupations identified by the VE reflected a "significant number of jobs in the national economy."  (R. at 15.)  Thus, the ALJ properly addressed Plaintiff's objection in her opinion.

Third, Plaintiff has not proven the VE's job numbers to be unreliable. VEs have experience using methodologies to interpret raw data from data sources like Job Browser Pro to help create job numbers. *See Wischmann v. Kijakazi*, 68 F.4th 498, 506-07 (9th Cir. 2023) (quoting *White v. Kijakazi*, 44 F.4th 828, 837 (9th Cir. 2022)) ("The letter does not show that the data enclosed 'were produced using the same methodology as that used by the VE.'").  It is reasonable for an ALJ to find an attorney providing only raw data, without any expertise-driven interpretive methodology behind it, unpersuasive in demonstrating that a VE's job numbers are inconsistent with their data sources.  *See id.* (comparing the persuasiveness of "a VE with expertise in developing job

29

numbers" to "the attorney himself, who has 'no identified expertise in calculating job figures in the national economy'" (quoting *Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1194 (9th Cir. 2022))); *see also Natasha B. C. v. King*, No. 4:23-cv-5473, 2025 WL 314967 (D.S.C. Jan. 28, 2025).  It is also reasonable for an ALJ to find a VE's calculations more reliable due to their extensive education and professional experience compared to a lay opinion offered by a claimant or their counsel.  The ALJ here properly relied on the expertise of the VE, instead of the lay opinion of Plaintiff's counsel.

Finally, Plaintiff's post-hearing objection only challenged the numbers for one occupation (paper-pattern inspector).  (R. at 296-97.)  Even if it was error for the ALJ to rely on this one number, any error was harmless because the other two occupations reflected a "significant number of jobs in the national economy," together totaling 25,500 jobs.  (R. at 15.)  *See McCall*, 844 F. App'x at 681-82 (citing a case finding that 25,000 jobs nationwide was a "large enough number to represent a significant number of jobs"); *Jonathan M. H. v. Kijakazi*, No. 3:21-cv-600, 2022 WL 3643385, at *12 (E.D. Va. Aug. 8, 2022), *report and recommendation adopted*, 2022 WL 3635441 (E.D. Va. Aug. 23, 2022) (finding 18,300 jobs in the national economy as a "significant" number of jobs); *Sophia M. v. Kijakazi*, No. 2:20-cv-584, 2021 WL 3878899, at *5-6 (E.D. Va. Aug. 10, 2021), *report and recommendation adopted*, 2021 WL 3857633 (E.D. Va. Aug 30, 2021) (citing a case that identifies 10,000 jobs in the national economy as a "significant" amount).  Plaintiff raised no objection to the other two job numbers nor did he claim that they are insufficient to support the ALJ's findings.  (*See* R. at 296-97.)  This precludes Plaintiff from showing harm or prejudice from the alleged error. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (stating that the burden of establishing a harmful error "falls upon the party attacking the agency's determination"); *Mascio*, 780 F.3d at 639-40 (recognizing harmless error in the context of social

security disability determinations); *Bisceglia*, 173 F. Supp. 3d at 333-34 (considering "the likelihood that the result would have been different" had the ALJ not erred in determining whether error was harmless) (quoting *Shinseki*, 556 U.S. at 411-12).

## V.    CONCLUSION

For the reasons set forth above, the Court will DENY Plaintiff's Motion for Summary Judgment (ECF No. 9), GRANT the Commissioner's Motion for Summary Judgment and Brief in Support Thereof (ECF No. 11), and AFFIRM the final decision of the Commissioner.    An appropriate Order will accompany this Memorandum Opinion.

/s/

Summer L. Speight
United States Magistrate Judge

Richmond, Virginia
Date: March 27, 2026